IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. **01-cv-02056-JLK**

**UNITED STATES AVIATION UNDERWRITERS, INC., a New York corporation;
PAUL LEADABRAND, an Idaho resident; and JEFLYN AVIATION, INC. dba
ACCESS AIR, an Idaho corporation**,

       Plaintiff,

v.

**PILATUS BUSINESS AIRCRAFT, LTD, a Colorado corporation; PILATUS
FLUGZEUGWERKE AKTIENGESELLSCHAFT, a Swiss corporation, PILATUS
AIRCRAFT, LTD, a Swiss corporation; PRATT & WHITNEY CANADA, INC.,
and DOES 1 through 500, Inclusive**,

       Defendants.

---

## ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT
---

KANE, J.

      This aircraft products liability action between the lost aircraft's insurer and

manufacturers of the aircraft chassis and engine was the subject of a previous summary

judgment order at *U.S. Aviation Underwriters, Inc. v. Pilatus Business Aircraft, Ltd.*, 358

F. Supp.2d 1021 (D. Colo. 2005)(rejecting assertion Plaintiffs' cause of action barred by

economic loss doctrine). It is before me now on two additional summary judgment

motions of Defendants seeking (1) a determination that Plaintiffs' evidence is insufficient

to create a triable issue on Plaintiffs' negligence and strict products liability claims and

(2) that in the alternative, Plaintiffs were contributorily negligent as a matter of law by

flying in violation of applicable Federal Aviation Regulations (FARs).   After fully

considering the parties' briefs, the record and applicable legal authorities, I find oral

argument unnecessary and rule as follows:

1.      ***Pilatus Defendants' Motion for Summary Judgment*** (Doc. 56)(in which
        Defendant Pratt & Whitney joins)(challenging sufficiency of Plaintiffs' evidence
        to establish elements of strict products liability or negligence actions under Rest.
        (2d) Torts § 402A).

        Applying the appropriate standards for considering motions for summary judgment

under Rule 56(c),[1] I view the following facts from the record in the light most favorable

to Plaintiffs:

        While cruising at an altitude of 27,000 feet, the pilot of the Pilatus model PC-

12/45 at issue reported a high engine temperature (1144EC) and heard "popping and

grinding noises" from the engine.  The pilot shut down the engine, and noticed the

propeller come to a "sudden grinding stop."   As the aircraft descended toward the water,

the pilot tried to restart the engine.  The pilot noticed the engine temperature rise but the

propeller did not rotate.  The pilot aborted the restart and ditched the aircraft in the water,

where it later sank.  Smith and his three Japanese passengers floated for 15 hours in a life

---

[1]      Summary judgment is appropriate "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to a judgment as a
matter of law." Fed. R. Civ. P. 56(c).  When applying this standard, I view the evidence and draw
reasonable inferences therefrom in the light most favorable to the nonmoving party.  *See Simms v.
Oklahoma ex rel. Dep't Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir.
1999). A genuine issue of material fact exists if a rational juror could decide the disputed
allegations in the non-movant's favor based on the evidence presented and the disputed fact might
affect the outcome of the suit under the governing law. *See Schwarz v. Bhd. of Maint. of Way
Employees*, 264 F.3d 1181, 1183 (10th Cir. 2001).

raft before being picked up by a passing Russian container vessel.  7/11/2001 Statement

of Michael Smith (attached as Ex. A-2 to Defs.' Mot. Summ. J. (Doc. 56-3)).  Neither the

aircraft nor its engine has been recovered.

In a Service Bulletin dated March 22, 2005, engine manufacturer Pratt & Whitney

Canada ("Pratt & Whitney") notified owners of a "problem" with "blade fractures in the

field and wear at the shroud contact face" of the turboprop engine at issue and

recommended replacement of the "second stage power turbine blade with a new

redesigned one."  3/22/05 Service Bulletin (attached as Ex. 10 to Pls.' Resp. to Mot.

Summ. J.).   The service bulletin describes compliance with its recommendation as

"optional, and can be done at the discretion of the operator."  *Id.* p. 2.  There is deposition

testimony and evidence in the record suggesting Pratt & Whitney engines had at least

some limited history of inflight engine failures (albeit at a rate of 21 per million) and that

Pilatus had written Pratt & Whitney well before the issuance of the 2005 Service Bulletin

encouraging Pratt & Whitney to "put more priority on these issues."  *See e.g.*, Bretscher

Dep. at 242-48.   On the basis of these facts, Plaintiffs' expert David Rupert concludes

the most likely cause of the symptoms that prompted Smith to shut down the engine and

abort efforts to restart it was the failure of one or more of the power turbine (PT) blades

in the engine's power section.  Decl. of David Rupert, ¶ 17.0.

Airworthiness standards prescribed by Federal Aviation Administration (FAA)

regulations provide that turbine engine installations comply with several requirements,

including that, as installed, "[i]t must be possible to restart [the] engine in flight."  14

C.F.R. § 23.903(e)(3).  Plaintiffs point to the pilot's inability to restart the engine in flight

to argue the aircraft was not airworthy under § 23.903(e)(3) at the time it was sold to DJS

for Access Air's use.

Based on these facts, Plaintiffs contend that on July 8, 2001, the aircraft and its

engine assembly (the "Products") "were in a defective condition and unreasonably

dangerous."  Compl. ¶ 17.0.  Specifically, Plaintiffs contend the Products were defective

in their manufacture, design and by virtue of Defendants' failure to warn of the risks

associated with engine failures or in flight shutdowns.  *Id.* ¶ 13.0.

Defendants move for summary judgment on several grounds.  Defendants assert

that by the close of discovery, Plaintiffs had offered no evidence of defect, either in the

manufacture or design of the Products, and no evidence of negligence.  In addition,

Defendants argue opinion testimony of Plaintiffs' expert David Rupert as to the cause of

the inflight engine failure and shutdown is inadmissible "because it is based on self-

proclaimed expertise, insufficient and unreliable facts, subjective belief and unsupported

speculation, not actual knowledge and it fails to eliminate other possible sources as highly

improbable or demonstrate that power turbine blade failure is highly probable."  Mot.

Summ. J. (Doc. 56) at p. 1.  I reject both contentions.


A.      David Rupert's Opinions are Admissible under FRE 702 and *Daubert*.

Defendants' *Daubert* challenge to Plaintiffs' expert David Rupert is unpersuasive.

Defendants contend Rupert's opinions are unreliable and therefore inadmissible under

FRE 702 because they are (1) based on his "self-proclaimed expertise" rather than "actual knowledge," (citing *Lovato v. Burlington Northern & Santa Fe Ry.*, 2002 U.S. Dist. LEXIS 16844, 7-9 (D. Colo. 2002); because they are "tentative" and "speculative"; because there is "too great an analytical gap between the data and the opinion proffered" (citing *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1206 (10th Cir. 2002)); and because Rupert did not eliminate other possible sources as highly improbable or demonstrate that the cause identified is highly probable.   The only specifics Defendants offer are their critique that Rupert had no "actual knowledge" of the abnormal engine symptoms reported by the pilot, compared incidents involving power turbine blade failures in PT6A-67D engines rather that the PT6A-67B engine at issue, and did not rule out other causes of the PT blade failure in this case.  Mot. Summ. J. at 10-11.  "Without reliable relevant facts to support his opinion," Defendants conclude, "it is mere speculation and inadmissible."  *Id.* at 11.

The applicable standards are found in F.R.E. Rule 702 as construed by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*,119 S. Ct. 1167 (1999).  Rule 702 provides:  "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  Rule 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony ... is not only relevant, but reliable."  509

U.S., at 589.  In *Kumho*, the Court extended this gatekeeping obligation not only to "scientific" testimony, but to all expert testimony.   *Id.* at 1171.

In *Daubert*, the Court articulated the district court's gatekeeping function as entailing "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  509 U.S. at 592-93.  "Many factors" will bear on the inquiry, the Court continued, including whether a "theory or technique ... can be (and has been) tested"; whether it "has been subjected to peer review and publication"; whether, with respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."  509 U.S. at 593-94.  These factors do not constitute a "definitive checklist or test," *id.*, at 593, and are intended merely as "general observations" that should assist the "flexible" inquiry envisioned by Rule 702.  *Id.* at 595.

> The overarching subject [of Rule 702] is the scientific validity and the evidentiary relevance and reliability of the principles that underlie a proposed submission.  The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Id.*

Defendants' challenges to Rupert's methodology are either wrong (Rupert did address and rule out other causes of the PT blade failure, and I find Defendants' explanation that he ruled out causes of the abnormal *sounds* reported by the pilot but not

6

other causes of the PT blade's "failure" nothing more than semantic gamesmanship)[2] or

unsupported by any contrary expert opinion or legal authority.  Rupert's resume attached

as Ex. 16 to Plaintiffs' Opposition to Mot. Summ. J. belies the suggestion he has only

"self-proclaimed" expertise, and Rupert's reliance on "second-hand" knowledge (which

was provided not only by the pilot but by Defendants' own 30(b)(6) designees) is part of

an accepted "differential diagnosis" methodology of determining cause in accident

investigations generally.  *See Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1238 (10th Cir.

2004)(accident investigator's "reasoning to the best inference" approach to eliminating

alternative possible causes of gas leak as improbable to conclude gas leak was caused by

copper sulfide contamination was a valid scientific technique to establish causation, as

required for investigator's proffered testimony to be admissible).  While Defendants are

correct in arguing that an expert employing the "differential" or "inference to the best

explanation for the cause of an accident" methodology must "eliminate other possible

sources as highly improbable, and must demonstrate that the cause identified is highly

probable," *see id.*, it is also true that an expert is not required to exclude each and every

possible alternative cause before such an approach is considered "reliable" under

*Daubert.*

    An expert must show that other causes are improbable when conducting

---

[2]     Mr. Rupert did consider and attempt to rule out alternate causes of the PT blade
failure, including Pratt & Whitney's opinion that the propeller did not rotate during the attempted
restarts due to "thermal expansion" (Decl. ¶ 20.0) and the suggestion that ice ingestion or foreign
debris caused the PT blade failure (Rupert Decl. ¶¶ 20.0. 20.1).

> differential diagnosis, but '[t]his is not to say that an expert, in order to
> testify on causation, must be able to categorically exclude each and every
> possible alternative cause····' – to require otherwise 'would mean that few
> experts would ever be able to testify.'

*Bitler* at 1238,  n. 6 (quoting Stephen A. Saltzburg et al., Federal Rules of Evidence

Manual 702-33 (8th ed.2002)).

Based on my review of Rupert's testimony, his supporting documents and

depositions and the legal authorities cited by both sides, I conclude Mr. Rupert's opinions

are sufficiently reliable under the factors outlined in *Daubert* to warrant their admission

under FRE 702.  Defendants' critiques may go to the weight to be accorded Mr. Rupert's

causation opinion by the jury, but not its admissibility.

B.     Plaintiffs are not limited in their proof of a "manufacturing" defect in this case to
       evidence of nonconformance with manufacturing specifications.

Defendants employ a series of increasingly narrow interpretations of the applicable

statutory provisions and case law governing strict product liability actions to conclude

Plaintiffs's proffered "circumstantial" evidence of defect in the aircraft and aircraft

engine assembly is either irrelevant or inadmissible to their claims.  Specifically,

Defendants argue Plaintiffs are limited in their proof to evidence the engine failed to

conform to manufacturing specifications at the time it was installed in the aircraft, and

deny the existence of a such a defect can be inferred from the pilot's 14 C.F.R. §

23.903(e) or by resort to the "risk benefit" or "consumer expectations" tests for strict

products liability on which Plaintiffs rely.  Absent direct evidence of a manufacturing

defect – impossible in this case given that the aircraft and the engine currently lie at the

8

bottom of the sea – Defendants argue Plaintiffs cannot prove the element of "defect" and that Defendants are therefore entitled to summary judgment.

In *Hiigel v. General Motors Corp.*, 544 P.2d 983, 987 (Colo. 1975), the Colorado Supreme Court adopted the doctrine of strict liability in tort set forth in the Restatement (Second) of Torts § 402A, providing for a cause of action against manufacturers or sellers of "any product in a defective condition unreasonably dangerous to the user or consumer or to his property." As developed in Colorado case law and codified at Colo. Rev. Stat. § 13-21-401, a product liability action means strict products liability arises when a product is unreasonably dangerous to the user because of a defect resulting from "the manufacture, construction, design, formula, installation, preparation, assembly, testing, packaging, labeling, or sale of any product, or the failure to warn or protect against a danger or hazard in the use, misuse, or unintended use of any product, or the failure to provide proper instructions for the use of any product." Colo. Rev. Stat. § 13-21-401(2).

A "manufacturer" for purposes of strict products liability is any person or entity who "designs, assembles, fabricates, produces, constructs, or otherwise prepares a product or a component part of a product prior to the sale of the product to a user or consumer," and "includes any seller who is owned in whole or significant part by the manufacturer or who owns, in whole or significant part, the manufacturer." § 13-21-401(1). Similarly, a "manufacturing defect," while it may be as simple as a flaw in the manufacturing process such that a product comes off the line in nonconformity with manufacturing specifications, also encompasses defects in the "construction, installation,

9

preparation, assembly, testing, or packaging" of a product.  *See* § 13-21-401(2), *applied in* C.J.I.4th Civ. 14:3, DEFECTIVE, UNREASONABLY DANGEROUS – DEFINED, Notes on Use ("A product is unreasonably dangerous because of a defect in its manufacture [or in an appropriate case, 'substitute one or more of the following for the word 'manufacture': construction, installation, preparation, assembly, testing, or packaging] if it creates a risk of harm to persons or property that would not ordinarily be expected.").

Based on the foregoing, Plaintiffs assert the Pilatus aircraft and its engine assembly were in an unreasonably dangerous condition at the time of the incident because of a "manufacturing [construction, installation, assembly, preparation, testing]" defect, a "design" defect, and by virtue of Defendants' "failure to warn" users of problems and dangers associated with the engine's PT blades.  Defendants suggest Plaintiffs have abandoned their design defect and failure to warn theories of relief, and invoke *Camacho v. Honda Motor Co., Ltd.*, 741 P.2d 1240, 1246 (Colo. 1987)(en banc), to argue only direct evidence of nonconformity with manufacturing specifications is relevant to a strict products liability claim premised on a "manufacturing" defect.  *Camacho* stands for no such proposition, and Defendants' argument is wrong.

Strict products liability is the manifestation of a public policy decision to allocate the burden of accidental injury and loss resulting from products placed in the marketplace from the consumers who use them to those who place them there.  *Camacho*, 741 P.2d at

1246 (quoting Rest. § 402A, comment c).[3]   The focus of the inquiry is on the relative

safety or dangerousness of a product placed by a manufacturer or seller into the

marketplace, *Camacho*, 741 P.2d at 1245 ("[a] consumer is justified in expecting that a

product placed in the stream of commerce is reasonably safe for its intended use, and

when a product is not reasonably safe a products liability action may be maintained"),

irrespective of the precise nature or type of defect alleged.  Colo. Rev. Stat. § 13-21-

401(2)(a "products liability action" is an action brought for or on account of personal

injury or property damage "caused by or resulting from the manufacture, construction,

design, installation, assembly, testing, packaging, labeling, or sale of any product, or the

failure to warn or protect against a danger or hazard in the use, misuse, or unintended use

of any product . . .").

    This focus on the dangerousness of the product and not on the specific type of

---

[3]    *See* Rest.(2d) Torts, § 402A, comm. c:

> On whatever theory, the justification for strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

11

"defect" is important.  Defendants invert the focus, arguing Plaintiffs must first prove the subject engine was defective before any inquiry into its relative safety or dangerousness is permitted.  *See e.g.,* Sur-Sur Reply at 2.   Defendants are incorrect.

It is clear from any considered review of the Restatement, § 13-21-401 and case law applying both that the "in a defective condition unreasonably dangerous to the user" standard for liability under § 402A permits "defect" to be inferred from the fact of a product's failure to perform as expected where the circumstances surrounding that failure suggest the product posed an unreasonable danger as sold.  *See* C.J.I.4th Civil 14:3 (defining "Defective, Unreasonably Dangerous" as a merged inquiry turning on product's failure to perform as intended); *Camacho*, 741 P.2d at 1245 (the inquiry under § 402A is whether "a *product* [not, 'a defective product'] placed in the stream of commerce is reasonably safe for its intended use")(emphasis mine).

The fact a "defect" is characterized as a "manufacturing" defect does not limit the type of evidence a plaintiff may offer in support of his claim.  As set forth above, "manufacturing defect" is an inclusive concept encompassing errors in the manufacture, construction, installation, preparation, assembly, testing, or packaging of a product.  Colo. Rev. Stat. § 13-21-401(2).  The fact one type of "manufacturing defect" may be that a product leaves the factory not conforming to specifications does not mean that any time a plaintiff operates under a "manufacturing defect" theory of relief he must produce

evidence of nonconformity to prevail.[4]  In other words, where, as here, plaintiffs allege a

product was in a defective unreasonably dangerous condition by virtue of its

manufacture, construction, installation, or testing, they are not limited to proof of

nonconformity with manufacturer's specifications to prevail on their claim.

C.    While the risk-benefit test must be applied in design defect cases, both the
      consumer expectations and design defect cases may be applied in cases alleging
      manufacturing defects.

In their Sur-Sur Reply, Defendants' retreat from their initial position that the

consumer expectations test does not apply in manufacturing defect cases.  "[Defendants]

did not argue that the consumer expectations test could not be use[d] in a manufacturing

defect case . . . . [i]ts argument was that the plaintiff must prove both the defect and

failure to meet consumer expectations."   I rejected Defendants' assertion that proof of a

"defect" is separate from, and a necessary factual predicate to, any inquiry into a

product's relative safety or dangerousness in the previous section and I will not repeat it

---

[4]      Defendants rely exclusively on *Camacho* to argue Plaintiffs must prove
nonconformity with a manufacturer's specifications to prevail on their "manufacturing defect"
theory of strict products liability in this case. Defs. Sur-Sur-Reply at p. 2.  *Camacho*, however,
was a *design* defect case whose only mention of nonconformity to manufacturer specifications
occurs in dicta as part of a generalized observation that the § 402A inquiry is more easily
answered in a simple manufacturing defect case where a product is alleged to have been faultily
manufactured.  In such a case, the question is "whether the product as produced conformed with
the manufacturer's specifications." 741 P.2d at 1247.  The Court in *Camacho* goes on to explain,
however, that "[r]esolution of whether a particular product is unreasonably dangerous is more
difficult in design defect or failure to warn cases, where the product has been manufactured
exactly as intended." *Id.  Camacho* does not address "manufacturing" defect cases based on a
product's defective "construction, installation, preparation, assembly, [or] testing," which
products, under Colorado law, may be demonstrated to be unreasonably dangerous if they
"create[] a risk of harm to persons or property that would not ordinarily be expected." C.J.I.4th
Civ. 14:3.

here.

D.  <u>Plaintiffs' evidence is sufficient to withstand summary judgment on their negligence and strict products liability claims based on design defect, manufacturing defect, and failure to warn</u>.

*Statutory presumption of defect or non-defect from 14 C.F.R. § 23.903(e)(3)*

In any product liability action, "it shall be rebuttably presumed that the product which caused the injury, death, or property damage was not defective and that the manufacturer or seller thereof was not negligent if the product [c]omplied with, at the time of sale by the manufacturer, any applicable code, standard, or [federal] regulation." Colo. Rev. Stat. § 13-21-403(1)(b).  The statute goes on to provide that, "[i]n like manner, noncompliance with a government code, standard, or regulation existing and in effect at the time of sale of the product by the manufacturer which contributed to the claim or injury shall create a rebuttable presumption that the product was defective or negligently manufactured." *Id.* § 13-21-403(2).

As previously introduced, FAA airworthiness regulations require that turbine engines of the type at issue in this case be capable of restarting in flight.  14 C.F.R. § 23.903(e)(3).  Because the Pilatus aircraft was FAA certified, Defendants invoke § 403(1)(b) to argue they are entitled to a rebuttable presumption that the aircraft and engine assembly were not defective at the time they were delivered to DJS.  Plaintiffs argue the engine's failure and inability to restart during the flight in question entitle them to a rebuttable presumption that the aircraft and its engine assembly *were* defective under § 403(2).

14

Defendants' suggestion that FAA certification affords all aircraft and aircraft component part manufacturers a presumption of nonliability for defects that may only later manifest themselves is facile.  There is no suggestion the FAA certification process entails actual testing of all aircraft and aircraft components it covers and no suggestion the FAA shut down and restarted the Pratt & Whitney engine "certified" in this case during flight.  Defects such as the PT blade weakness/friability alleged here may be latent and reveal themselves only over a period of time or through usage clearly foreseeable by the manufacturer.  Any statutory presumption that would operate to shift the risk of loss from such defects away from manufacturers and toward consumers (or the FAA) as Defendants suggest runs directly contrary to § 402A and the public policy choices it embodies.

Plaintiffs' application of Colorado's statutory presumption is more evocative, and flows into the ultimate issue on summary judgment, namely, whether Plaintiffs' evidence is sufficient to allow a reasonable trier of fact to conclude the PC-12 aircraft and its Pratt & Whitney engine assembly were in a defective and unreasonably dangerous condition at the time they were delivered to DJS for use by the Plaintiffs.

*Plaintiffs' Evidence.*

To rebut the assertion that they lack sufficient evidence to avoid summary judgment on their negligence or strict liability claims in this case, Plaintiffs rely on pilot Smith's statement; deposition testimony from Pilatus and Pratt & Whitney designees – including Bretscher's testimony regarding known problems with Pratt & Whitney's PT

15

blades in its PT6A-67B engines; the March 2005 Service Bulletin recommending the replacement of second stage PT blades in PT6A-67B engines; and Rupert's opinion that the symptoms experienced by pilot Smith on the day in question were the result of an engine failure and in particular a failure in one or more of the engine's PT blades.

Plaintiffs also invoke Colo. Rev. Stat. § 13-21-402(2) to assert they are entitled to a rebuttable presumption that the engine was defective or negligently manufactured irrespective of Rupert's opinion or any other "circumstantial" evidence they have.  The argument is an interesting one in this case, where the presumption sought depends on the existence of a factual prerequisite – i.e. that the engine *was*, in fact, incapable of being restarted – which is in dispute.[5]  Let us assume, for the sake of argument, that the jury is persuaded by the testimony of Smith and Rupert that the engine, indeed, was incapable of being restarted after it was shut down in flight.  Should a rebuttable presumption arise at that point that the engine was negligently or defectively manufactured, what is accomplished in essence is a shifting of the burden of going forward on the fourth element of Plaintiffs' cause of action under C.J.I.4th Civ. 14:1.  The jury would be instructed to find that the aircraft/aircraft engine assembly was in a defective unreasonably dangerous condition at the time of the incident unless Defendants proved

---

[5]      Plaintiffs contend the pilot shut down the engine after hearing popping and grounding sounds coming from it and observing an extremely high engine temperature, and that the engine failed to engage when he attempted to restart it.  According to Defendants, the pilot improperly shut down the engine and then aborted the restart, so that it cannot, as a matter of fact, be determined that the engine actually was "incapable" of being restarted.

16

otherwise.  Plaintiffs would continue to have the burden of proving the products were

defective at the time they left Defendants' respective custody or control (element 5), that

the products were expected to and did (elements 6 & 7) reach Plaintiffs without

substantial change, and that the defect was the cause of Plaintiffs' loss (element 10).[6]  A

---

[6]      The full text of C.J.I.4th Civ. 14:1, modified to reflect the facts of this case and for
consistency with my rulings and instruction 14:3, is set forth below.  I reserve the right to modify
this instruction further before using it in any trial that may ultimately ensue in this case.  The jury
will not be required to make findings of elements of liability that are not in dispute.

14:1  ELEMENTS OF LIABILITY

        For Plaintiffs to recover from any of the Defendants on their claim of sale
of a defective product, you must find all of the following have been proved by a
preponderance of the evidence as to each Defendant:

        1.  Defendant was a manufacturer of the [description of product or
component part] (this may be stipulated);

        2.  Defendant was engaged in the business of selling [manufacturing,
constructing, assembling, installing, etc., the aircraft/aircraft engine/engine
assembly] for resale, use or consumption (also stipulated) ;

        3.  The defendant sold [manufactured, constructed, assembled, etc. the
aircraft/engine/engine assembly];

        4.  The product or component part was in a defective condition
unreasonably dangerous to Plaintiffs or Plaintiffs' property;

        5.  The [aircraft/engine/engine assembly] was defective at the time it was
sold [manufactured, constructed, assembled, installed, tested, etc.] by the
Defendant or left Defendant's custody or control;

        6.  The [aircraft/engine/engine assembly] was expected to reach Plaintiffs
without substantial change in the condition in which it was sold;

        7.  The [aircraft/engine/engine assembly] did reach Plaintiffs without
substantial change in the condition in which it was sold [manufactured,
constructed, assembled, installed, tested, etc.];

determination of the precise procedure to be followed is unnecessary at this juncture, because for purposes of summary judgment, I find Plaintiffs' evidence sufficient even without the presumption to  proceed to trial.

Defendants first Motion for Partial Summary Judgment (Doc. 56) is **DENIED.**

2. ***Pilatus Defendants' Motion for Partial Summary Judgment Re Negligence as a Matter of Law*** (Doc. 55)(in which Defendant Pratt & Whitney joins).

In this Motion, Defendants seek a determination that, whatever their ultimate liability to Plaintiffs for negligence, Plaintiffs Leadabrand and Access Air were contributorily negligent as a matter of law for flying in violation federal safety regulations governing commercial carriers when the incident happened.   Specifically, Defendants contend Access Air was negligent as a matter of law on July 8, 2001 in (1) flying outside the geographic limits of Access Air's Operations Specification in violation of 14 C.F.R. § 119.5(j); and (2) operating beyond gliding distance of land in violation of 14 C.F.R. § 135.183.  Plaintiffs deny the operating requirements for commercial carriers under Parts 119 and 135 of the Federal Aviation Regulations (FARs) applied to them during their operations over the Sea of Okhotsk, and maintain they were operating as a "private"

---

8.  Plaintiff was a person reasonably expected to use, consume or be affected by the [aircraft/engine/engine assembly] (should be stipulated);

9.  Plaintiff had [injuries, damages, losses];

10. The defect was a cause of Plaintiff's [injuries, damages, losses].

\* \* \*

18

carrier under the less stringent requirements of Access Air's Part 91 certification.

The issue is complex and involves a multitude of factors under the applicable regulations. After thoroughly considering the regulations, the parties' cited authorities and consulting additional secondary and administrative authorities in the area, I find the issue ultimately turns on the factual question of whether, regardless of the promotional nature of the around-the-world flight at issue, Access Air was a noncommon carrier providing aircraft operation "for compensation or hire." Were I the trier of fact on this issue, it is likely Defendants' interpretation would prevail. However, because Plaintiffs have come forward with sufficient facts to create a genuine issue regarding the nature of the "expense sharing" arrangement between them and their Japanese passengers, I decline to take it from the jury and deny Defendants' Motion on that basis.

A.    <u>Regulatory Framework</u>.

Federal regulations governing aeronautics and aircraft operations under title 49 of the United States Code have been promulgated by the Department of Transportation's Federal Aviation Administration (FAA) and are found in title 14 of the Code of Federal Regulations. General operating and flight "rules of the road" are found in Part 91 of title 14, with additional rules for "air carriers and commercial operators" engaged in "on demand" or "taxi" operations located in Parts 119 and 135, respectively. 14 C.F.R. §§ 91, 119 & 135. *See generally In re N-500L Cases*, 691 F.2d 14, 28 (1ˢᵗ Cir. 1982).

"Generally speaking, FAR Part 91 applies to private or non-commercial carriage. 'Common carriers,' on the other hand, have traditionally been subject to the more stringent safety standards of FAR Part 135." *Thibodeaux v. Executive Jet Int'l, Inc.*, 328 F.3d 742, 745 (5th Cir. 2003).

A closer look at the regulations and interpretive administrative policy statements and rulings suggests the "private," versus "commercial" or "common," carriage distinction is imprecise and does not, by itself, answer the question presented in this case. "Common" carriers certified to operate under Part 135, for example, may also operate "privately" outside the scope of Part 135. Similarly, "noncommon" or "private" carriers may engage in operations which, by their nature or by virtue of being conducted for compensation or hire, require compliance with higher safety and operations requirements of Part 135. It is the interconnection between these two concepts that must be examined.

B.    Applicable Facts.

The following facts are undisputed, unless otherwise indicated:

•    In early 2001, Access Air received an inquiry regarding an opportunity to undertake an around-the-world flight for certain entities or individuals in Japan. Access Air characterizes the inquiry as one for a "promotional" flight, sponsored by the Japanese entit(ies), which was outside the scope of its regular operations.

•    Access Air contacted its FAA operations inspector Chester Waite about the inquiry.

•    At the time, Access Air was certified by the FAA to operate under Subchapter G,

20

Parts 119 and 135 of the Federal Aviation Regulations as an "Air Carrier."

- Access Air's operations under Part 135 were limited to the United States, Canada and Mexico.

- Such a flight would not have been authorized under Access Air's Part 135 Operations Specifications, but Access Air denies it was operating as an "Air Carrier" in undertaking this trip.

- Given time constraints precluding an amendment to those Specifications and the fact that the flight was a "promotional" shared expenses operation and not a full scale charter, Access Air believed it could lawfully undertake the flight under its Part 91 general operating certification, rather than its Part 135 certification.

- Waite did not challenge Access Air's statement that it could undertake the flight privately under its Part 91 certification, rather than as a "carrier" under Part 135.

- Sometime thereafter, three Japanese passengers contracted with Access Air to furnish an airplane and pilot for an around-the-world flight, and paid Access Air a specified hourly and daily rate for its services.  Access Air contends this was a "shared expense" arrangement outside the scope of its carrier certification. According to Defendants, payment was at Access Air's normal charter rate such that it was an arrangement "for compensation or hire."

- On July 8, 2001, the aircraft lost power on a leg from Hakodate, Japan to Magadan, Russia, resulting in an emergency water landing approximately 200 miles off the eastern coast of Russia over the Sea of Okhotsk.

21

• Access Air's pilot and the three passengers were rescued by a Russian tanker from their life raft, but the airplane itself was lost.

C.   Discussion.

Subchapter F of title 14, C.F.R., sets forth general "Air Traffic and General Operating Rules" for private operators of airplanes (as well as moored balloons, kites, unmanned rockets and balloons, ultralight vehicles, and parachute operations).  The less-stringent "general operating and flight rules" governing private operators are found in Part 91 of Subchapter F.  Subchapter G of title 14 governs the certification and operation of "Air Carriers and Operators for Compensation or Hire," and includes Part 119 governing certification and operating specifications for "air carriers" and "commercial operators," as well as Part 135 setting forth "operating requirements [for] commuter and on demand" aircraft operations.

There is no dispute in this case that, if the regulations in Parts 119 and 135 governed the around-the-world operation of the PC-12 aircraft at issue, Access Air was in violation of one or more of its applicable FARs.  Defendants contend the more stringent operating specifications apply because Access Air was operating as a "commercial" or "common" carrier as a matter of law when it transported the Japanese passengers within the meaning of those regulations.  In the alternative, Defendants contend Access Air was bound to comply with the requirements of Part 135 even if it were operating under Part 91 because, by operation of 14 C.F.R. §  91.703, United States registered aircraft operating outside the U.S. must comply with Annex 2 to the Convention on International Civil Aviation, and under § 135.3, pilots operating under Annex 2 must comply with "the most restrictive [applicable] regulations," including Part 135.  Pilatus Defs' Surreply (Doc. 86) at 3.  Because Defendants' latter contention hinges on an untenable reading of the

22

regulations,[7] I focus my attention on Defendants' first.

The rules at issue in Part 135 apply to "commuter" or "on demand" operations of persons holding, or required to hold, and Air Carrier Certificate or Operating Certificate under part 119 (governing air carriers and commercial operators). 14 C.F.R. § 135.1(1). It is undisputed that Access Air holds such a certification. Pursuant to Part 119 of those same regulations, air carriers and "commercial operators" engaged in the carriage of persons or property for compensation or hire shall conduct their "commuter" and "on demand" operations in accordance with the applicable requirements of part 135. *See* 14 C.F.R. § 119.21(a)(4), (5).

Strictly speaking, then, the rules set forth in part 135 apply only to common carriers and commercial operators conducting "commuter" or "on demand" operations. However, even operators engaging in "noncommon" or "private" carriage operations may be required to comply with the more stringent specifications of Part 135 if they conduct that carriage "for compensation or hire" in aircraft with 20 or fewer seats, excluding crewmembers. *See* 14 C.F.R. § 119.23(b). Thus, there are at least two ways in which Access Air could have been bound by the rules set forth in Part 135 of the FARs on the flight in question: (1) if it was operating as a "commercial" or "common" carrier in its transport of the three Japanese passengers on the around-the-world

---

[7]     Defendants' attempt to bootstrap Section 135.3 onto the application of the Annex 2 regulations to overseas operations conducted under Part 91 of the FARs is unavailing. By definition, Section 135.3 applies to "commuter" and "on demand" operations conducted under Subchapter G of title 14 governing common or commercial carriers. So understood, Defendants' tautological assertion is that Access Air, *if* it were a common or commercial carrier subject to Parts 119 and 135 of the FARs, would be required to comply with Annex 2 of the Convention on International Aviation "and with any rules of . . . this part [Part 135] that are more restrictive than that Annex." *See* 14 C.F.R. § 135.3 (a)(2). Because the question of whether Access Air must, as a matter of law, be considered a common or commercial carrier subject to Parts 119 and 135 of the FARs is the ultimate question to be answered, an argument relying on the application of Part 135 must await that determination.

flight at issue; or (2) if, irrespective of its status as a "common" carrier, it was conducting

"noncommon" or "private" carriage "for compensation or hire" within the meaning of 14 C.F.R. §

119.23(b).[8]  For purposes of my analysis, it is undisputed that the single-engine PC-12 Pilatus

aircraft at issue had a passenger-seat configuration of fewer than 20 seats.

The term "common carrier" is not defined in the Federal Aviation Act or the Federal

Aviation Regulations.  Guidance, therefore, must be found in other sources in order to determine

whether a particular operator was a common carrier with respect to the flight or flights in

question.  *See Woolsey*, 993 F.2d at 522.  Access Air points me to FAA Advisory Circular 120-

12A (attached as Ex. 1 to Pl.'s Opposition Brief), which was used in *Woolsey* and identifies the

question of whether a carrier "held itself out" to the public as being willing to transport for hire,

indiscriminately, as the "crucial" factor in such a determination.  Access Air denies it held itself

out to the public, generally, to provide any "around-the-world" travel to anyone who demanded it

maintains that absent evidence it did so, Defendants cannot carry their burden on summary

judgment.

In my view, Access Air may be reading Advisory Circular 120-12A too narrowly.[9]

---

[8]        While not raised by Defendants, there appears to be a third possibility, and that is
that Access Air was bound to comply with Part 135 in any event simply by virtue of its foreign
operation in this case, and because its "private" Part 91 certification does not extend beyond the
continental U.S. and Mexico/Canada.

[9]        Advisory Circular 120-12A, entitled "PRIVATE CARRIAGE VERSUS
COMMON CARRIAGE OF PERSONS OR PROPERTY," purports to furnish guidelines for the
FAA and interested segments of the airline industry for determining whether current or proposed
transportation operations by air constitute private or common carriage.  It provides that "[i]f the
operations are in interstate or foreign commerce, this distinction determines whether or not the
operator needs economic authority as an 'air carrier' from the Department of Transportation."
The Circular sets forth various guidelines and scenarios for distinguishing "common" and
"private" carriage, setting forth the following example particularly apt in this case:

However, because of 14 C.F.R. § 119.23(b), the "common" versus "private" carrier distinction does not, by itself, answer the question presented in this case.

"Noncommon" carriage is defined in the FARs as "an aircraft operation for compensation or hire that does not involve a holding out to others." 14 C.F.R. § 119.3. Accordingly, the salient question is not whether Access Air "held itself out" to the public, generally, as a provider of "around-the-world" passenger flights, but whether Access Air, in this particular instance, provided the flight to the Japanese passengers at issue "for compensation or hire." Access Air contends its operation in this case was not "for compensation or hire" but was a "promotional" opportunity in which the Japanese sponsor contracted for its services on a "shared expense" basis. Defendants, however, have presented evidence that the "shared expense" basis included payment by the Japanese promotional sponsors of amounts commensurate with Access Air's normal charter costs per hour.

"Where it is doubtful that an operation is for 'compensation or hire,' the test applied is whether the carriage by air is merely incidental to the person's other business or is, in itself, a major enterprise for profit." *See* 14 C.F.R. § 1.1. Access Air denies this test even applies –

---

h. Persons admittedly operating as common carriers in a certain field (for instance, in intrastate commerce) sometimes claim that transportation for hire is private carriage. To sustain such a claim, the carrier must show that the private carriage is clearly distinguishable from its common carriage business and outside the scope of its holding out. The claimed private carriage must be viewed in relation to and against the background of the entire carrying activity. Historically, Civil Aeronautics Board decisions have concluded that only in rare instances could carriage engaged in by a common carrier be legitimately classified as private.

AC 12-12A (attached as Ex. 1 to Pls' Opp. to Mot. Summ. J. (Doc 66-2)). The Circular concludes that, "[i]n summary, persons intending to conduct only private operations in support of other business should look cautiously at any proposal for revenue-generating flights which most likely would require certification as an air carrier." *Id.*

25

arguing there can be no "doubt" that its services in this case were not "for compensation or hire" – but maintains Defendants would not be entitled to summary judgment if it were because there is no evidence to suggest the trip at issue was a "major enterprise" for profit, rather than merely "incidental" to Access Air's other business.  I disagree with Access Air's contention that the nature of its services in this case are without a doubt *not* "for compensation or hire."  However, while Access Air's contention that it was acting exclusively as a "private" operator bound only by Part 91 of the FARs when it provided the around-the-world services at issue in this case is debatable under the applicable FARs and interpretive law, it is also not clear that it was acting as a "common" or "noncommon" carrier subject to 135 as a matter of law.  The question is one for the finder of fact or, perhaps, the court on a Rule 50 motion at the conclusion of all the evidence.

BASED ON ALL OF THE FOREGOING, the Pilatus Defendants' pending Motions for Partial Summary Judgment in this case (Docs. 56 and 55), in which Defendant Pratt & Whitney join, are **DENIED.**

This case is now ready for a pretrial conference, to be set by separate Minute Order.

Dated this 29th day of September, 2006, at Denver, Colorado.

**s/John L. Kane**
SENIOR U.S. DISTRICT JUDGE

26